IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 15-346 |
| v. | : | HON. HARVEY BARTLE, III |
| CHAKA FATTAH, SR.<br>HERBERT VEDERMAN | : | |
| ROBERT BRAND<br>KAREN NICHOLAS | : | |
| BONNIE BOWSER | : | |

GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE DEFENDANTS
FROM INTRODUCING EVIDENCE OF OR ARGUMENT FOR
JURY NULLIFICATION AND EVIDENCE OF PRIOR GOOD ACTS

The United States of America, by its undersigned attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, Paul L. Gray, Assistant United States Attorney, Eric L. Gibson, Trial Attorney and Special Assistant United States Attorney, and Jonathan I. Kravis, Trial Attorney, moves this Court to prohibit the defendants from presenting evidence or argument at trial in support of jury nullification through the testimony of witnesses, the questions posed by defense counsel during witness examination, or arguments of defense counsel. The government also moves this Court to prohibit the defendants from introducing evidence of purported prior good acts under Federal Rules of Evidence 404 and 405. In support of this motion, the government states as follows.

I.   **FACTUAL BACKGROUND**

A. The Indictment

On July 29, 2015, the grand jury returned a 29-count indictment charging the defendants with, among other things, RICO conspiracy, bribery, conspiracy to commit wire fraud, conspiracy to commit honest services wire fraud, mail fraud, bank fraud, and money laundering.

1

The indictment alleges that defendant Chaka Fattah Sr., who has been a member of the United States House of Representatives since 1995, and the other members of the Enterprise used Fattah's political campaigns and two non-profit organizations he founded, the Educational Advancement Alliance ("EAA") and College Opportunity Resources for Education Philly ("CORE Philly"), to commit numerous criminal offenses over a nine-year period, including: violating campaign finance laws, stealing charitable and federal grant funds, misusing campaign funds for personal expenses, engaging in a bribery scheme, defrauding a financial institution and federal agencies, and falsifying records in an unsuccessful and elaborate effort to conceal this criminal activity.

The indictment first alleges that Fattah and other members of the Enterprise used Fattah-founded non-profits EAA and CORE Philly to repay a $600,000 debt from Fattah's unsuccessful 2007 mayoral campaign with funds that EAA received from Sallie Mae and from the National Aeronautics and Space Administration ("NASA") for educational purposes. During Fattah's failed 2007 campaign for Mayor of Philadelphia (Fattah for Mayor—FFM), Fattah and members of the Enterprise secretly borrowed $1 million from a lone wealthy Fattah supporter. In order to conceal the contribution, which made a mockery of Philadelphia's campaign finance laws, Fattah arranged for his supporter to disguise the money as a loan to cooperating defendant Thomas Lindenfeld's consulting company, LSG, via a fraudulent promissory note. In turn, Lindenfeld and cooperating defendant Gregory Naylor, another political consultant, and Bonnie Bowser at Fattah's direction used $600,000 of the wealthy supporter's money to prop up Fattah's mayoral campaign, including spending $200,000 in cash as "walking around money" on election day. After Fattah lost the election, Lindenfeld, again at Fattah's direction, returned $400,000 to the supporter, leaving a debt of $600,000 still owing.

When the finances of Fattah's big donor took a turn for the worse, he sought repayment of the outstanding $600,000 debt, and Fattah did not have the funds to repay him. Fattah and members of the Enterprise arranged for a non-profit entity Fattah founded and controlled, EAA, which was run by his former staffer, Karen Nicholas, to unlawfully use charitable and federal grant funds to repay his campaign debt. The funds were passed through two companies on their way from EAA to Fattah's supporter: a for-profit company run by Robert Brand, and Lindenfeld's company, LSG.

The indictment further alleges that members of the Enterprise knew that the Sallie Mae and NASA funds could not be used to repay Fattah's campaign debts, and therefore they falsified contracts and made false entries in their books, tax returns, and campaign finance disclosure statements. As recently as 2014, Fattah and Bowser submitted false campaign finance disclosure statements for FFM containing misrepresentations related to the scheme. The indictment further alleges that Fattah and members of his Enterprise went to such lengths because the debt was incurred through a large contribution from a single donor in violation of Philadelphia's campaign finance laws, and therefore had to be repaid under circumstances hidden from the public, and, in particular the voters.

According to the indictment, in March of 2008, Brand began to contact Nicholas to inquire about the unexecuted fake contract between Brand's company and EAA which was unsigned by Nicholas even though she had already routed the money to Brand's company months earlier. While Brand was attempting to reach Nicholas, auditors from the U.S. Department of Justice ("DOJ") were performing an audit of EAA regarding federal funds EAA had received. On March 23, 2008, Nicholas responded to Brand via email and stated, in part, "[The DOJ auditors] are still very uncomfortable with your contract amongst other things and

3

depending on their findings some of the [federal grant] funding may have to be returned . . . And you should know in the future that as a result of the DOJ audit I will not be in a position to do another contract such as this."

While the DOJ audit was ongoing and Nicholas continued with her attempts to explain EAA's questionable finances to the auditors, DOJ's Office of Inspector General ("DOJ OIG") issued a subpoena duces tecum on or about July 17, 2008 to Brand and his company seeking any and all "contract documents, invoices, correspondence, timesheets, deliverables, and proof of payment, related to any services provided to or payments from [CORE] Philly or [EAA]."  By August 26, 2008, Brand had still not responded to the DOJ OIG subpoena, and DOJ OIG contacted Brand by email to inquire as to the delay.

In the interim, on or about August 1, 2008, Brand contacted Nicholas via email, and Nicholas executed the contract on behalf of EAA, during the DOJ audit, after the issuance of a subpoena, and nearly seven (7) months after making the initial payment of $500,000, which was ultimately used to repay Fattah's big donor.

According to the indictment, NASA, too, had concerns regarding EAA's stewardship of federal grant funds.  NASA OIG subpoenaed EAA's books and records on May 6, 2009.  Nicholas and EAA made a partial production in response while Nicholas's then-lawyer negotiated with investigators to narrow the scope of the subpoena.  The indictment alleges that while the negotiations were taking place in October of 2009, prior to finalizing EAA's production to NASA OIG's subpoena and prior to submitting a final closeout report to NASA regarding the agency's grant funds, Nicholas electronically changed the classification of a payment to CORE Philly to hide the scheme to repay Fattah's wealthy supporter.

The indictment next alleges a scheme involving Fattah's effort to unlawfully compensate Lindenfeld and his consulting firm for Lindenfeld's work on the mayoral campaign which included a bill from LSG of approximately $130,000. Following Fattah's defeat in the mayoral election, he met with Lindenfeld and proposed—as a means to extinguish his debt to Lindenfeld—that he (Fattah) would arrange the award of a federal earmark/grant for the benefit of Lindenfeld. Even though Lindenfeld was based in Washington, D.C. and in the business of political consulting, the earmark would involve coastal environmental conservation and be directed to a non-profit entity that did not yet exist. Fattah directed Lindenfeld to apply for a $15 million earmark to an entity named "Blue Guardians" through the National Oceanic and Atmospheric Administration (NOAA). In the process at Fattah's direction, Lindenfeld obtained Brand's consent to use Brand's Philadelphia business address as a mail drop for "Blue Guardians." In exchange for Fattah's efforts to arrange the earmark, Bowser and Fattah began reducing FFM's debt to Lindenfeld annually in $20,000 increments on FFM's campaign finance statements.

The third scheme alleged in the indictment involves Fattah's perpetration of a fraud involving the misappropriation of funds from his mayoral campaign, FFM, as well as his congressional campaign, Fattah for Congress (FFC), in an attempt to extinguish the college debt of his son. To execute the scheme, Fattah and Bowser arranged for FFM to make payments—disguised as consulting payments—to Naylor's consulting company so that Naylor could pay down the son's debt. As a means to ensure that FFM had sufficient funds to fund the payments to Naylor, Bowser, who also served as FFC's and FFM's campaign treasurer, periodically moved money from the congressional campaign to the mayoral account. All told, between 2007 and 2011, Naylor made thirty-four successful loan payments on behalf of Fattah's son, totaling

5

approximately $27,000.  Further, while Fattah and his co-conspirators were misappropriating campaign funds to help his son, Fattah and members of the Enterprise, defrauded at least two of FFM's vendors/creditors by convincing them to forgive FFM's outstanding debt based on the claim that the campaign did not have sufficient funds to make repayment.

The indictment also alleges a scheme relating to Fattah's receipt of various things of value from Herbert Vederman, a wealthy lobbyist, in exchange for official acts Fattah undertook to benefit Vederman.  Specifically, beginning in 2008, Fattah initiated a lengthy effort—including meetings, emails, telephone calls, and other correspondence with individuals in the Legislative and Executive Branches—to secure for Vederman an ambassadorship or an appointment to a United States Trade Commission.  In exchange, Vederman provided money to Fattah, using Fattah's son as an intermediary to disguise the payments.  Portions of these funds were used by Fattah to pay personal expenses, including his taxes.

The indictment further alleges that in early 2012, Vederman made an $18,000 payment to Fattah, so that Fattah and his spouse could qualify for a mortgage intended to finance the purchase of a vacation home in the Poconos.  In exchange, Fattah hired Vederman's girlfriend, who resided in Florida, as a staffer in his congressional office in Philadelphia.  As a means to deceive the mortgage lender and evade applicable House Ethics rules prohibiting gifts from lobbyists and requiring disclosure on Fattah's financial disclosure form, Fattah, Vederman, Bowser, and Fattah's spouse falsely styled Vederman's $18,000 payment as having been made as part of a car sale.  Notwithstanding the fact that the co-conspirators falsified records, including a bill of sale and paperwork related to the vehicle's title, to document the "sale" of the 1989 Porsche 911 belonging to Fattah's spouse, Vederman never took possession of the vehicle from the Fattahs.  Indeed, the Fattahs continued to possess, drive, and insure the Porsche well after the

purported "sale" to Vederman. According to the indictment, the Porsche was still parked on the Fattahs' property twenty-six (26) months after the "sale."

The indictment also alleges that in furtherance of the RICO enterprise, Nicholas defrauded the National Oceanic and Atmospheric Administration (NOAA) out of $50,000 in grant funds which she claimed would be used by EAA to support the Fattah-founded Conference on Higher Education. Once EAA gained access to the funds, Nicholas wrote a $20,000 check to Naylor, another member of the Enterprise, and misappropriated the balance for her personal benefit, including a $10,000 payment to the attorney representing her in this matter. According to the indictment, by late 2011, EAA was experiencing financial difficulty, and Nicholas began looking for additional streams of grant money. To that end, between December 2011 and August 2012, Nicholas made repeated misrepresentations to NOAA in order to secure funding for an October 2012 Conference on Higher Education that Nicholas never organized and that never took place. By the time NOAA awarded $50,000 for the purported conference, EAA was already winding down its operations and laying off employees. Although no October 2012 conference ever took place, Nicholas deposited the NOAA funds into EAA's sole operating account in March 2013. In addition to the payments to Naylor and her attorney, Nicholas used the commingled funds to write eight checks to herself over the next four months, totaling approximately $27,400. To further conceal the scheme, on or about January 8, 2014, Nicholas backdated a false report to NOAA which described in detail a Conference on Higher Education purportedly held "Friday, October 19 through Sunday, October 21, 2012" which featured "Congressman Chaka Fattah" as the keynote speaker.

**B.  The Defendants' Statements**

In the short time since this case has been indicted, defendant Fattah as well as counsel and associates of the other defendants have made statements to the media suggesting that the defendants may attempt to argue to the jury that the charges are motivated by some unspecified political agenda on the part of the prosecutors and that defendants may attempt to present evidence of their purported prior good acts to rebut the charges.  For example:

- "My work has been acclaimed by President Obama and President Clinton," [Fattah] said.  "My family's work to help young people has been acclaimed by President Reagan and President Carter.  That we would be involved…in any type of nefarious activity, I think defies the record."  "Confident Fattah Is Dismissive of Federal Case Against Him," Philadelphia Inquirer 8/4/15.

- "'There are a lot of people who are excited about the fact that there are charges brought against me,' [Fattah] added." *Id.*

- "'I think it's truly unfortunate that there have been efforts to attack my family,' Fattah said.  'Going after my family is completely inappropriate and unfortunate.'" *Id.*

- "Fattah has denied the charges against him and dismissed the investigation as nothing more than a political witch hunt."  "Fattah Case Was Built Over Years," Philadelphia Inquirer 8/3/15.

- "This has been an eight-year effort by some in the Department of Justice to link my public-service career to some form of wrongdoing.  With today's charges, this misguided campaign has now moved from speculation to specific allegations."  "Like Son, Like Father:  Fattah Indicted," Philadelphia Daily News, 7/30/15.

- "As I have previously stated, I have never participated in any illegal activity or misappropriation of taxpayer dollars as an elected official.  For the last 21 years, I have represented the people of Philadelphia in Congress with honor and dignity, helping millions of families through my efforts focused on education, employment, mortgage relief, and health care," Fattah said.  "I will proudly continue to serve my constituents and look forward to helping millions more."  Id.

- "I've never been involved in any wrongdoing, any unlawful activity or misappropriation of federal funds.  I have spent my time helping people.  We have helped at least 25 million that we can count.  And I will spend my time helping millions more."  CNN, 7/29/15

8

- "[Former Pennsylvania Governor Ed] Rendell on Wednesday defended [Herbert Vederman], calling him as 'honorable and decent and trustworthy a person as I've met in my 36 years in public life . . . Vederman 'worked 10, 12 hours a day . . . literally seven days a week' without taking a city paycheck or benefits.'"  "In Fattah Indictment, A Big Name from Rendell Era Resurfaces," Philadelphia Inquirer, 7/30/15.

- "[Karen] Nicholas' defense attorney, Ann C. Flannery, said her client 'devoted her entire career to helping underprivileged youth.'"  "A Look at Three Aides Indicted with Fattah," Philadelphia Inquirer, 7/30/15.

Most recently, in a direct attempt to address the prospective jury pool with a message linking the charges with his purported good works as a politician, defendant Fattah posted a video on YouTube on August 18, 2015, the day before his arraignment, with the following statements:

- "As it relates to these allegations, I am innocent of each and every one, but moreover, I am…and I think it speaks so much about the character [sic], that other innocent people, in my family, in our community, who have worked hard on behalf of our young people and on behalf of our city, some for a dollar a year, people who we have known and who have been a part of the Philadelphia community and have never been involved in any type of illegal activity, that they have been brought into this is so unfortunate."  YouTube video available at https://www.youtube.com/watch?v=9IvZQHz1f4g&app=desktop, at 1:02-1:41.

- "They have an allegation that I have done something improper to help my son go to college.  But much more importantly to you, you know that I have helped more young people in our city, region, and country than anyone else that can be identified.  They got some question about a mortgage.  Well, there's nothing improper there, but what is true is that I have brought for people in Philadelphia and in our region for thirty years relief on challenges related to their mortgages, and on a national level I helped usher in about a $5 billion program so that there are people in our country today who are able to meet their mortgage payments, stay in their homes and raise their families.  That's so much more important, the work that we're doing on brain health, should tell you a lot about my understanding of the challenges that face us.  But I would never be involved in mindless illegality."  *Id.* at 2:08-2:59. [1]

---

[1] These public pronouncements intended by Fattah and others to interfere with a fair trial and prejudice the due administration of justice foreshadow future potential violations of this District's Rule 53.1 regarding extrajudicial statements in criminal cases and are inappropriate in any event.  *See* E.D. Pa. Crim. R. 53.1.  In particular, the video posted on YouTube by Fattah the day before his arraignment is a transparent attempt to communicate directly to the prospective jury pool improper messages, including (1) that he must be innocent of the charges against him because of the purported good work that he has done as a congressman, (2) that his work on

9

## II.     ARGUMENT

This case is about the defendants' guilt or innocence of the charges set forth in the indictment, not about the defendants' purported good acts or about some supposed political motivation for the investigation or prosecution.  Accordingly, the defendants should be precluded from presenting evidence or arguing to the jury that the jury should reach a verdict based on any consideration other than the evidence presented at trial, including any political motivation for the investigation or specific instances of good conduct by the defendants in the past.  The defendants should also be precluded from introducing evidence of their purported prior good acts under Federal Rules of Evidence 404 and 405.

### A. THE DEFENDANTS SHOULD BE PRECLUDED FROM PRESENTING EVIDENCE OR ARGUING IN FAVOR OF JURY NULLIFICATION.

Jury nullification is "a jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue…or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness." *United States v. Boone*, 458 F.3d 321, 328 n.2 (3d Cir. 2006) (quoting *Black's Law Dictionary* 875 (8th ed. 2004)).  In *Boone*, the Third Circuit explained that a juror who "commits jury nullification violates the sworn jury oath and prevents the jury from fulfilling its constitutional role." *Id.* at 326.  The federal courts "categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is

---

behalf of the community is "much more important[]" than any legal response to the charges, (3) and that "it speaks so much about the character [sic]" that his co-defendants have also been indicted given their years of loyal service to him.

10

within their authority to prevent." *United States v. Carr*, 424 F.3d 213, 220 (2d Cir. 2005) (quoting *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997)).

Introducing evidence in favor of jury nullification also violates Federal Rules of Evidence 401 and 402.  Rule 401 defines "relevance" as "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable."  Rule 402 provides that irrelevant evidence is inadmissible.  Evidence in support of jury nullification has no tendency to make the existence of any fact related to guilt or innocence more or less probable, and therefore it is not admissible.

Accordingly, the trial court may preclude defense attorneys from attempting to present evidence or arguments in favor of jury nullification.  *United States v. Moss*, 297 Fed. Appx. 839, 841 (11th Cir. 2008); *United States v. Rosenthal*, 454 F.3d 943, 946-47 (9th Cir. 2006); *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996); *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993).

In this case, the public comments set forth above suggest that the defendants may attempt to argue to the jury that they should be acquitted for reasons other than the evidence presented at trial of guilt or innocence.  Those comments include references to unspecified political motivations underlying the investigation of this case as well as statements connecting the charges in this case to purported good acts of the defendants as public officials.  To prevent the injection of such improper considerations into the trial, an order is warranted precluding the defendants from introducing evidence or making arguments in favor of jury nullification.

### B. THE DEFENDANTS SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE OF PRIOR GOOD ACTS.

Based on public statements by defendant Fattah and others linking the defendants' claims of innocence to statements regarding purported good acts they have allegedly performed as some

11

sort of public service, including statements made by Fattah in a video posted on YouTube the day before his arraignment, the government expects that one or more of the defendants may attempt to introduce evidence of specific prior good acts at trial. Such evidence is inadmissible under Federal Rules of Evidence 404 and 405.

### 1. The Defendants' Prior Good Acts Are Not Relevant to a "Pertinent Trait."

Federal Rule of Evidence 404(a)(1) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." This rule means that "[e]vidence of a person's character is generally not admissible to prove that he acted in conformity therewith on a particular occasion." *Government of the Virgin Islands v. Grant*, 775 F.2d 508, 510 (3d Cir. 1985). The rule applies to prior good acts as well as prior bad acts of the defendant. As the Sixth Circuit has explained, "For the same reason that prior 'bad acts' may not be used to show a predisposition to commit crimes, prior 'good acts' generally may not be used to show a predisposition not to commit crimes." *United States v. Dimora*, 750 F.3d 619 (6th Cir. 2014). In other words, "evidence of good conduct is not admissible to negate criminal intent." *United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008).

Rule 404(a) includes a limited exception for criminal defendants, but that exception does not apply here. Rule 404(a)(2) provides that a criminal defendant "may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." That exception does not apply in this case because the defendants' purported prior good acts are not relevant to any character trait that is "pertinent" to any of the charges against them. As the federal courts have recognized, examples of prior good acts performed by a

defendant public official are not "pertinent" to charges that the defendant on other occasions committed crimes from public office.

Thus, for example, in *United States v. Warner*, 396 F. Supp. 2d 924, 941 (N.D. Ill. 2005), aff'd, 498 F.3d 666 (7th Cir. 2007), the defendant sought to introduce evidence in a RICO and fraud trial that as governor he had committed good acts including commuting the sentences of all defendants on death row. The trial court granted the government's motion to exclude that evidence under Rules 404 and 405. The court noted that there was "no meaningful relationship" between the defendant's prior good acts and the crimes with which he was charged. 396 F. Supp. 2d at 941. The court also rejected the defendant's argument that his prior good acts were probative of the "pertinent trait" of "personal integrity," explaining that "[i]t simply does not logically follow that decisions made by a public official on policy matters make him more or less honest, truthful, or law-abiding." *Id.* at 942 (quoting Gov't Reply at 11).

Decisions from other federal courts are to the same effect, uniformly rejecting the proposition that a public official's prior good acts are relevant in a criminal trial. *See, e.g.*, *United States v. Marley*, 2015 WL 3555793, at *3-*4 (11th Cir. June 9, 2015) (upholding trial court's decision to exclude evidence of good acts performed by defendant in fraud prosecution on the ground that "evidence of the defendant's good conduct is not admissible to negate his criminal intent"); *United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011) ("prior good acts performed by the defendants allegedly for the good of the United States" inadmissible under Rule 404); *United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) (upholding trial court's decision in fraud case to exclude evidence of defendant's "purportedly legitimate business activities" on the ground that "evidence of good conduct is not admissible to negate criminal intent"); *United States v. Washington*, 106 F.3d 983, 999 (D.C. Cir. 1997) (upholding trial

court's decision to exclude evidence regarding the defendant's "dedication, aggressiveness and assertiveness" as a law enforcement officer on the ground that those traits were "neither 'pertinent' to nor an 'essential element' of his supposed lack of predisposition to engage in the corrupt criminal activity with which he was charged"); *United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir. 1990) (upholding trial court's decision to exclude evidence of "commendations received by" the defendant "in military service and as a police officer" on the ground that "the traits which they purport to show…were hardly 'pertinent' to the crimes of which [the defendant] stood accused"); *United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir. 1983) (upholding trial court's decision to exclude evidence that the defendant "was a good county commissioner" on the ground that "[e]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant").

In this case, defendant Fattah has proclaimed his innocence in public statements referencing his efforts to "represent[] the people of Philadelphia in Congress with honor and dignity." In those public statements, defendant Fattah has specifically cited his "work to help young people" and his "efforts focused on education, employment, mortgage relief, and health care." However, like Governor Ryan's work on the death penalty, defendant Fattah's work on these issues as a congressman is irrelevant to his guilt or innocence of the charges in the indictment. Accordingly, the Court should preclude Fattah and the other defendants from introducing evidence of their purported good acts as public officials at trial.

### 2. The Defendants' Prior Good Acts Are Inadmissible Under Rule 405.

The defendants' purported prior good acts are also inadmissible under Federal Rule of Evidence 405. Rule 405 states, "When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the

form of any opinion." Thus, even if the defendants' prior activity as public officials were somehow related to a "pertinent trait"—which it is not—Rule 405 would permit evidence of that "pertinent trait" only in the form of testimony about the defendants' reputation or testimony in the form of an opinion about character, not in the form of specific prior good acts. *See United States v. McMahan*, 394 Fed. Appx. 453 (10th Cir. 2010) (upholding trial court's decision in bribery case to exclude evidence of specific instances when the defendant "refused to accept a questionable campaign contribution" or "did not provide favorable treatment to" the briber on the ground that the defendant's "attempt to employ evidence of specific instances of prior conduct to circumstantially prove his lack of intent to commit state-law bribery is prohibited" by the Federal Rules of Evidence); *Warner*, 396 F. Supp. 2d at 942 (concluding that "[e]ven if" public official's "policy decisions were somehow relevant under Rule 404(a)(1)," pursuant to Rule 405 the "proper form of that evidence would be through reputation or opinion testimony," not through specific good acts undertaken as a public official).[2]

WHEREFORE, the government respectfully submits that its motion to prohibit the defendants from presenting evidence or argument at trial in support of jury nullification through the testimony of witnesses, the questions posed by defense counsel during witness examination, or arguments of defense counsel should be granted. Further, the government's motion to prohibit the defendants from introducing evidence of purported prior good acts under Federal Rules of Evidence 404 and 405 should also be granted.

---

[2] Should the Court permit the defendants to offer character evidence in the form of reputation or opinion testimony, the government is permitted under Rule 405(a) to inquire of witnesses on cross-examination about their knowledge of specific acts of misconduct by the defendants.

Respectfully submitted,

| | |
|---|---|
| ZANE DAVID MEMEGER<br>United States Attorney<br>Eastern District of Pennsylvania | RAYMOND HULSER<br>Chief, Public Integrity Section<br>Criminal Division<br>U.S. Department of Justice |
| By: | |
| /s/  Paul L. Gray<br>PAUL L. GRAY<br>Assistant United States Attorney | /s/  Eric L. Gibson<br>ERIC L. GIBSON<br>Trial Attorney |
| | JONATHAN I. KRAVIS<br>Trial Attorney<br>Public Integrity Section<br>Criminal Division<br>U.S. Department of Justice |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants.


Dated: 26 August 2015          /s/  Eric L. Gibson
                               ERIC L. GIBSON
                               JONATHAN KRAVIS
                               Trial Attorneys
                               Public Integrity Section
                               Criminal Division
                               U.S. Department of Justice

                               PAUL L. GRAY
                               Assistant United States Attorney