IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA       :       CRIMINAL ACTION
                               :
          v.                   :
                               :
CHAKA FATTAH, SR.              :       NO. 15-346-1


MEMORANDUM

Bartle J.                                        March 16, 2016

         The defendant Chaka Fattah, Sr., a United States
Representative elected from the Second Congressional District of
Pennsylvania, has been indicted in a 29-count indictment along
with four other defendants:  Herbert Vederman ("Vederman"),
Robert Brand ("Brand"), Karen Nicholas, and Bonnie Bowser
("Bowser").  The indictment also references two unindicted
co-conspirators, Thomas Lindenfeld ("Lindenfeld) and Gregory
Naylor.

         All five defendants are charged in Count One with
conspiracy under the Racketeer Influenced and Corrupt
Organization Act, 18 U.S.C. § 1962(d).  Fattah is also named in
sixteen additional counts while the other four defendants are
also named in multiple counts, including some with Fattah.

         Fattah has now moved to dismiss Count Three (conspiracy
to commit honest services wire fraud, 18 U.S.C. §§ 1343, 1346,
and 1349), Count Sixteen (conspiracy to commit bribery, 18 U.S.C.
§ 371) and Count Seventeen (bribery, 18 U.S.C. § 201(b)(2)) of

the indictment on the ground that they infringe upon his rights under the Speech or Debate Clause of the Constitution.[1]  That provision states that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."  U.S. Const. art. I, § 6, ¶ 1.

The Speech or Debate Clause is rooted in English history and the struggles of the House of Commons to protect its members from intimidation by the King.  The Crown in times past used both the criminal and civil process against members who displeased it.  United States v. Johnson, 383 U.S. 169, 177-78, 180-83 (1966).  The Clause was engrafted into our Constitution to protect the independence of the Legislative Branch from improper encroachment by a potentially hostile Executive Branch or Judiciary.  Id. at 177-83.

The Supreme Court has stressed in United States v. Brewster, 408 U.S. 501, 512 (1972), that the Clause immunizes the members of Congress only to the extent of having to answer in either a criminal or civil proceeding for their "legislative acts or the motivation for legislative acts."  The Court explained:

---

1.  Fattah's motion originally sought dismissal of the entire indictment on this ground.  At oral argument, his lawyer clarified that Fattah seeks dismissal only of these three counts.

> A legislative act has consistently been defined as an act generally done in Congress in relation to the business before it.  In sum, the Speech or Debate Clause prohibits inquiry only into those things generally said or done in the House or Senate in the performance of official duties and into the motivation for those acts."

Id.  Legislative acts also include activities at committee hearings.  Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 504-06 (1975); Gravel v. United States, 408 U.S. 606, 624 (1972).  Nonetheless, "some nexus to legislative functions" without more is not enough to trigger the privilege.  Brewster, 408 U.S. at 528.

While "performing legislative activities" is protected, the Supreme Court has recognized that the duties of members of Congress are much more expansive.  Constituent services; making appointments with Government agencies; assisting in securing government contracts, news letters, and news releases; speeches outside of the halls of Congress; and other similar political activities, for example, are all legitimate aspects of the job of a representative or senator.  These activities, however, do not constitute legislative acts encompassed by the Speech or Debate Clause.  Brewster, 408 U.S. at 512.

The Speech or Debate Clause was not designed "to make Members of Congress super-citizens, immune from criminal responsibility."  Brewster, 408 U.S. at 576.  For example, it does not shield them from indictment for accepting a bribe as a

-3-

quid pro quo for a promise related to an official act.  It is the taking of a thing of value in return for making the promise that is the crime.  Whether the member of Congress fulfills his promise, reneges on his promise, or does nothing is irrelevant. Even if the promise was related to legislation, the bribery charge may proceed because it is unnecessary for the government to introduce any evidence of a legislative act as part of its proof.  Evidence of the acceptance of the bribe tied simply to the promise to undertake a legislative act is sufficient. Significantly, the protection of the Speech or Debate Clause does not reach a promise to perform a legislative act in the future. Brewster, 408 U.S. at 526-27; United States v. McDade, 28 F.3d 283, 293 (3d Cir. 1994).

It is also well settled that the efforts to lobby or influence the Executive branch to take certain action is "in no wise related to the due functioning of the legislative process," at least when legislative oversight or fact-finding is not involved.  Brewster, 408 U.S. at 513 (quoting Johnson, 383 U.S. at 172); McDade, 28 F.3d at 299-300; Virgin Islands v. Lee, 775 F.2d 514, 521 (3d Cir. 1985).[2]

---

2.  Whether or not a member of Congress was engaged in oversight or fact-finding in dealing with the Executive Branch can raise factual issues.  The burden is on the legislator to establish that the privilege applies in those circumstances.  Lee, 775 F.2d at 524.

With this background, we turn to the specific counts
and allegations in the indictment which Fattah challenges as
violating the Speech or Debate Clause.

Count Three of the indictment, as noted above, charges
Fattah and Bowser  with conspiracy to commit honest services wire
fraud in violation of 18 U.S.C. §§ 1343, 1346, and 1349.
Unindicted co-conspirator Lindenfeld is also implicated.  This
conspiracy relates to Fattah's promise to Lindenfeld to obtain a
congressional
earmark, that is an appropriation, for a non-profit organization
known as "Blue Guardians," formed by Lindenfeld.  In return for
this promise, Lindenfeld is alleged to have agreed to forgive a
campaign debt owed to him and his company, LSG, by Fattah for
Fattah's unsuccessful run for mayor of Philadelphia in 2007.

Count Three, which describes this offense in detail,
incorporates by reference a number of paragraphs found in Count
One on pages 7 and 12-14 of the indictment:

> 16.  The manner and means by which the
> defendants and their coconspirators agreed to
> conduct the affairs of the Enterprise
> included the following, among others:
>
>                    . . .
>
> c.   engaging in a corrupt exchange in which
>      FATTAH promised to use his position as a
>      United States Congressman to obtain
>      federal funds in the form of a
>      questionable earmark for a non-profit
>      entity that did not yet exist, in order
>      to pay off another mayoral campaign
>      debt[.]
>
>                    . . .

27.   After FATTAH lost the mayoral
primary in May 2007, FATTAH's mayoral
campaign owed Lindenfeld and LSG a
substantial sum of money for the work
Lindenfeld and LSG had done on FATTAH's
campaign, which included compensating
Lindenfeld for his role in funneling the
$1 million campaign contribution from
Person D into the mayoral race and repaying
that loan using the stolen charitable and
grant funds.  In 2008, FATTAH met with
Lindenfeld to discuss the outstanding sum
owed to LSG by FATTAH's mayoral campaign.
During the meeting, FATTAH told Lindenfeld
that FATTAH could not legitimately raise the
funds necessary to pay Lindenfeld and LSG
within the constraints of the campaign
finance laws.  FATTAH also told Lindenfeld
that FATTAH and his campaign, FFM, needed to
write down the debt to LSG publicly on its
Campaign Finance Reports.  In addition to
being required under the Pennsylvania
Election Code and the City of Philadelphia's
Campaign Finance Law, the Campaign Finance
Reports are used in the political arena as a
measure of a candidate's political strength
and viability because the disclosures show
how much money a political candidate raised,
how much the candidate has spent, and whether
the candidate satisfies his campaign's
financial obligations.  If the candidate
appears to ignore his campaign's creditors,
that makes it more difficult to raise future
funds, hire campaign staff, and obtain
services from vendors during future campaigns
while also creating issues related to the
candidate's public perception and rendering
the candidate vulnerable to attack from
political opponents.  To resolve the debt to
Lindenfeld's satisfaction and publicly erase
the debt, FATTAH proposed using his status as
a public official to instead obtain a federal
grant for Lindenfeld's benefit.

28.   FATTAH proposed that Lindenfeld
create a nonprofit organization called "Blue
Guardians."  Despite the fact that Lindenfeld
was in the business of political consulting,

FATTAH suggested that "Blue Guardians" could obtain federal funding for vaguely defined efforts concerning coastal environmental conservation.  Lindenfeld proceeded to create his organization, although it never engaged in any activity.  FATTAH instructed Lindenfeld to use a Philadelphia address for "Blue Guardians," and at FATTAH's direction, Lindenfeld obtained BRAND's agreement to provide BRAND's own Philadelphia business address as a mail drop for the not yet established "Blue Guardians."

29.  In exchange for FATTAH's promise of federal funds, FATTAH sought and received Lindenfeld's agreement to reduce the approximate $130,000 of reported debt owed by FATTAH to Lindenfeld's LSG and also to report the debt reduction on FFM's publicly filed Campaign Finance Reports.  FATTAH and BOWSER then began to record reductions to the debt owed to Lindenfeld and LSG on FFM's Campaign Finance Reports annually.

30.  To conceal the corrupt arrangement to settle FATTAH's mayoral campaign debt to Lindenfeld and LSG, FATTAH, BOWSER, and Lindenfeld, and others, known and unknown, agreed to falsify FATTAH's Campaign Finance Reports from the mayoral race.  FATTAH and BOWSER disguised the bribery scheme while at the same time publicly reducing the debt by falsely reporting annually that Lindenfeld had "forgiven" FFM's obligation to his firm in $20,000 increments each year.  In early 2010, FATTAH and BOWSER began falsely documenting "in-kind" contributions purportedly made by LSG to the mayoral campaign in the amount of $20,000 in FFM's annual Campaign Finance Report.  The deception was continued in each subsequent Campaign Finance Report filed through 2014, in which FATTAH, BOWSER, and FFM reduced the debt to LSG in the amount of $20,000 per year.  Each year, FATTAH and BOWSER falsely certified the accuracy of FFM's Campaign Finance Report.

31.  As set forth above, the election laws of Pennsylvania and Philadelphia are clear that "debt forgiveness" is a political contribution, and therefore subject to the contribution limits in a calendar year. In $20,000 increments, the members of the Enterprise would need seven (7) years to publicly write off the LSG debt in its entirety.  Since the members of the Enterprise began the write downs in 2010, it would be 2016 before the members of the Enterprise could write off the LSG debt entirely and appear publicly to be in compliance with the applicable campaign finance laws.

The indictment in Count Three adds the following[3]:

3.  It was a purpose of conspiracy to repay FATTAH's mayoral campaign debt owed to his political consultant, Lindenfeld, by promising to use FATTAH's official office to arrange a federal earmark for a non-existent entity named "Blue Guardians."

4.  It was further a purpose of the conspiracy to present FATTAH to the public as a perennially viable candidate for public office who honored his obligations to his creditors and was able to retire his publicly reported campaign debts.

---

3.  The paragraphs of the indictment, for some unknown reason, are not numbered consecutively.  For example, Count Three, which begins on page 48, starts with paragraph 1.

5.   It was further a purpose of the conspiracy to promote FATTAH's political and financial goals through deception by concealing and protecting the conspirators' activities from detection and prosecution by law enforcement officials and the federal judiciary, as well as from exposure by the news media, through means that included obstruction of justice and the falsification of documents including "Appropriations Project Questionnaires" and Campaign Finance Reports, and other documents and records.

6.   On or about the dates set forth below, in order to execute and conceal the scheme, and to promote a false image of FATTAH's political strength and viability, FATTAH and BOWSER continued the deception by submitting false entries in the mayoral campaign's publicly filed Campaign Finance Statements reducing the debt to Lindenfeld and LSG by recording fictitious and misleading "contributions in kind" in the amount of $20,000 per calendar year:

| Act in Furtherance | Date of Filing | Form |
|---|---|---|
| 6(a) | February 1, 2010 | 2009 Campaign Finance Report (FFM) |
| 6(b) | January 26, 2011 | 2010 Campaign Finance Report (FFM) |
| 6(c) | January 31, 2012 | 2011 Campaign Finance Report (FFM) |
| 6(d) | January 30, 2013 | 2012 Campaign Finance Report (FFM) |
| 6(e) | January 31, 2014 | 2013 Campaign Finance Report (FFM) |

The Campaign Finance Statements were signed
by FATTAH and BOWSER, affirming that FFM 'has
not violated any provisions' of the
applicable campaign finance laws.

The Supreme Court and our Court of Appeals have been
emphatic that a promise by a member of Congress to do something
in return for a bribe is not protected by the Speech or Debate
Clause even if the promise relates to legislation.  As mentioned
above, the Supreme Court explained in Brewster that the Speech or
Debate Clause does not make senators and representatives
"super-citizens, immune from criminal responsibility."  408 U.S.
at 516.  In that case, a Senator was indicted for agreeing, in
return for a bribe, to be "influenced . . . in respect to his
action, vote, and decision on postage rate legislation which
might at any time be pending before him in his official
capacity."  Id. at 525.  The Supreme Court held that the Speech
or Debate Clause did not protect the Senator.  Id. at 528.

In United States v. Helstoski, 442 U.S. 477, 489
(1979), the Supreme Court reiterated, "[p]romises by a Member [of
Congress] to perform an act in the future are not legislative
acts."  Our Court of Appeals, citing Helstoski, stated in McDade:

[T]he [Supreme] Court has held that the
Clause prohibits only proof that a member
actually performed a legislative act.  As the
Court has put it, the protection of the
Clause "extends only to an act that has
already been performed." . . .  Thus, the
Court has held, the Clause does not prohibit
closely related but nevertheless distinct
showings, such as that a member promised to
perform a legislative act in the future.

-10-

28 F.3d at 293 (citing <u>Helstoski</u>, 442 U.S. at 490; <u>Brewster</u>, 408 U.S. at 526-27).

The indictment with all its detail makes no reference to a legislative act performed by Fattah to implement his promise to Lindenfeld or to engage in legislative fact-finding.  We do not know whether any earmark was ever obtained or even whether any legislation was ever introduced or hearings held.  In any event, all of that is irrelevant.  It is the promise in return for the forgiveness of the campaign debt that is significant.  The promise of future action is all that the indictment alleges and all that is necessary to be alleged and proven.  The Supreme Court and our Court of Appeals teach that the Speech or Debate Clause affords Fattah no protection against the "Blue Guardians" allegations.

In addition to Count Three, the alleged conspiracy involving the "Blue Guardians," Fattah argues that the Speech or Debate Clause immunizes him from the charges in Count Sixteen and Seventeen of the indictment.  Count Sixteen charges him, along with Bowser and Vederman, with conspiracy to commit bribery in violation of 18 U.S.C. § 371.  Count Seventeen alleges that he engaged in bribery in violation of 18 U.S.C. § 201(b)(2).

These two counts allege, in essence, that Fattah with accepted a bribe from co-defendant Vederman in return for Fattah's lobbying an elected official and members of the Executive Branch for an ambassadorship for Vederman and later for

-11-

his membership on a United States Trade Commission.  The relevant

paragraphs of the indictment at pages 3, 7 and 17-19,

incorporated by reference in Counts Sixteen and Seventeen,

narrate the conspiracy and bribery offenses:

> 4.  Defendant HERBERT VEDERMAN, a
> former Deputy Mayor in the City of
> Philadelphia, was a finance director for FFM
> and lobbyist and senior consultant in the
> government affairs practice of a Philadelphia-
> based law firm, although FATTAH himself is
> not an attorney. VEDERMAN acted in his
> capacity as a finance director for FFM from
> 2007 through at least December 2011 as he
> continued to negotiate the resolution of
> FFM's outstanding campaign debts on FATTAH's
> behalf.  As a lobbyist and consultant in the
> government affairs practice at the law firm,
> VEDERMAN reported to and was supervised by a
> registered lobbyist.  From 2008 through 2011,
> FATTAH advocated for VEDERMAN's nomination
> for federal posts in the Executive Branch,
> including an ambassadorship.

> .  .  .

> 16.  The manner and means by which the
> defendants and their coconspirators agreed
> to conduct the affairs of the Enterprise
> included the following, among others:

> .  .  .

> f.   engaging in a bribery scheme in which
>      FATTAH received a series of payments
>      and things of value from VEDERMAN in
>      exchange for a series of official acts
>      that FATTAH took on behalf of VEDERMAN,
>      including attempting to secure
>      VEDERMAN's appointment as a United
>      States Ambassador or in another federal
>      post. .  .  .

> .  .  .

> 39.  From 2008 through 2012, FATTAH
> received a series of payments and things of

value from VEDERMAN in exchange for a series of official acts by FATTAH on VEDERMAN's behalf.

40.   Beginning on or around November of 2008, FATTAH began a lengthy campaign to influence the Executive Branch and obtain for VEDERMAN a presidential appointment as a United States Ambassador or a federal appointment to a United States Trade Commission.   FATTAH and his organization repeatedly pursued a federal appointment for VEDERMAN via meetings, emails, telephone calls, and letters with Elected Official B and various members of the Executive Branch including the White House Deputy Chief of Staff, the United States Trade Representative, and the President of the United States.

41.   In January, 2012, FATTAH hired VEDERMAN's girlfriend, A.Z., onto his Congressional staff in the Philadelphia District Office run by BOWSER.

42.   In exchange for FATTAH's official action and influence, VEDERMAN provided money to FATTAH on multiple occasions. VEDERMAN also agreed to sponsor a visa for FATTAH's live-in au pair and paid a portion of the au pair's college tuition. Occasionally, VEDERMAN used FATTAH's adult son as a "pass through" to hide the payments.   Portions of those funds that were passed through FATTAH's son were ultimately used by FATTAH to pay personal expenses, including personal taxes.

43.   On or about January 13, 2012, VEDERMAN made an $18,000 payment via wire transfer to FATTAH so that FATTAH and Person E could deceive the Credit Union Mortgage Association, Inc. ("CUMA") in qualifying for a mortgage on the purchase of a vacation home in the Poconos.   At Fattah's direction, his District Chief of Staff, BOWSER, provided the wiring instructions to VEDERMAN.

44.  In order to deceive CUMA, evade the House ethics rule prohibiting gifts from lobbyists, and falsely omit the $18,000 payment from FATTAH's official Congressional Financial Disclosure form, FATTAH, VEDERMAN, BOWSER, and Person E falsely styled the $18,000 transaction as a car sale. Specifically, the conspirators falsified records, including a bill of sale and paperwork related to the vehicle's title, in order to document the "sale" of Person E's 1989 convertible Porsche 911 Carrera (the "Porsche") to VEDERMAN.  FATTAH used the bribery proceeds from VEDERMAN to close on the vacation home.

45.  In fact, FATTAH and Person E still possessed, drove, and continued to insure the car well after the $18,000 payment was made by VEDERMAN, and VEDERMAN never took possession of the Porsche.  Specifically,

- On or about May 31, 2012, Person E renewed the annual registration for the Porsche in Person E's name with the Pennsylvania Department of Transportation;

- On or about June 13, 2012, Person E had the Porsche serviced in Conshohocken, PA and paid $1,575.73 for the maintenance;

- On or about September 24, 2012, FATTAH paid $1,141.90 from his FFC campaign account to the insurance company on the policy which insured Person E's Porsche;

- On or about October 23, 2012, FATTAH $573.45 from his FFC campaign account to the insurance company on the policy which insured Person E's Porsche;

- On or about November 30, 2012, Person E telephone the

-14-

insurance company which
insured the Porsche and
adjusted the car's insurance
coverage for the winter
months;

• On or about January 7, 2013,
FATTAH paid $1,326.00 from
his FFC campaign account to
the insurance company on the
policy which insured Person
E's Porsche;

• On or about March 28, 2013,
the Porsche was inspected by
the FBI in FATTAH's garage at
this home in Philadelphia
where it was still parked
twenty-six (26) months after
the purported "sale" to
VEDERMAN.

The indictment, at pages 37-38, goes on to describe

Fattah's part in the bribery scheme in further detail.  These

allegations are also incorporated into Counts Sixteen and

Seventeen:

58.  Beginning in late 2008 and
continuing for years, FATTAH supported
VEDERMAN's nomination for an ambassadorship,
a post that VEDERMAN dearly coveted.

59.  In or around November 2008, FATTAH
solicited in writing support from Elected
Official B for VEDERMAN's nomination for an
ambassadorship post almost as soon as the
ballots were counted in the 2008 presidential
election.

60.  FATTAH had another letter of
support for VEDERMAN prepared for FATTAH's
signature, which stated that VEDERMAN was
willing to serve as an ambassador almost
anywhere in the world, including hardship
posts.

61.  In or around February 2010, a
staffer, at FATTAH's direction, attempted to

arrange a meeting with the Chief of Staff of the President of the United States to discuss an ambassadorship for VEDERMAN.

62. In or around February 2010, FATTAH participated in a teleconference with an Elected Official D and the White House Deputy Chief of Staff ("DCOS"), during which FATTAH pressed the DCOS for an appointment for VEDERMAN in the Executive Branch.

63. At FATTAH's direction, a FATTAH staffer followed up with the White House on numerous occasions to see whether FATTAH's support for VEDERMAN's nomination was progressing.

64. In late October or early November 2010, FATTAH signed and hand-delivered to the President of the United States at an official event a letter dated October 30, 2010, advocating for VEDERMAN's appointment as a United States ambassador.

65. In or around May 2011, with little progress made on securing an ambassadorship for VEDERMAN, FATTAH turned towards obtaining for VEDERMAN an appointment in the Executive Branch to a federal trade commission.

66. In or around May 2011, FATTAH approached the U.S. Trade Representative at a reception and inquired whether he would meet with VEDERMAN to discuss such an appointment.

67. After the U.S. Trade Representative agreed to take the meeting, FATTAH directed a staffer to follow up with a series of emails to set up a formal meeting between VEDERMAN and the U.S. Trade Representative.

68. On May 20, 2011, at FATTAH's direction, a FATTAH staffer sent the U.S. Trade Representative a package of documents which included a copy of the letter FATTAH had signed and sent to Elected Official B lauding VEDERMAN's credentials and a short biographical description of VEDERMAN and other documents praising VEDERMAN.

69.  FATTAH's efforts culminated in a
meeting arranged by FATTAH's staff between
VEDERMAN and the U.S. Trade Representative on
or about June 6, 2011.

Paragraphs 71 through 95 of the indictment, at pages

38-43, further describe the various payments and things of value

Vederman provided to Fattah or for Fattah's benefit in exchange

for Fattah's efforts on Vederman's behalf.  These include

sponsorship of Fattah's live-in au pair, a check for her college

tuition, money to Fattah's son some of which was later deposited

in Fattah's account, and money to Fattah to help him and his

spouse purchase a vacation home with the payment disguised as a

sham transaction to purchase a Porsche owned by Fattah's spouse.

The effort of Fattah, a member of the House of

Representatives, to lobby the Executive Branch, including the

President of the United States, to nominate Vederman as an

ambassador or to appoint him to a United States Trade Commission

is not a legislative act.  The Supreme Court has made it quite

clear in a number of decisions that seeking to influence the

Executive Branch is not protected by the Speech or Debate Clause.

In Johnson, 383 U.S. at 172, the Supreme Court

explained:  "No argument is made, nor do we think that it could

be successfully contended, that the Speech or Debate Clause

reaches conduct, such as was involved in the attempt to influence

the Department of Justice, that is in no wise related to the due

functioning of the legislative process."

-17-

In <u>Brewster</u>, 408 U.S. 501, the Court quoted <u>Johnson</u> for the proposition that a Congressman's attempt to influence the Justice Department, an Executive Branch agency, is "in no wise related to the functioning of the legislative process."

In <u>Gravel</u>, 408 U.S. at 625, the Supreme Court spoke in a similar vein:  "Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies - they may cajole, and exhort with respect to the administration of a federal statute - but such conduct, though generally done, is not protected legislative activity."

The Court, in <u>Doe v. McMillan</u>, 412 U.S. 306, 313 (1973) quoting, in part, <u>Gravel</u>, reiterated:  "Members of Congress may frequently be in touch with and seek to influence the Executive Branch of the Government, but this conduct 'though generally done, is not protected legislative activity.'"

In <u>McDade</u>, 28 F.3d at 299, our Court of Appeals, recognizing these binding precedents, has declared when legislative oversight is not an issue, "the Supreme Court has repeatedly stated that the Speech or Debate Clause does not apply to efforts by members of Congress to influence the Executive Branch."

If cajoling the Executive Branch about the administration of a statute or attempting to influence the

-18-

Department of Justice or the Executive Branch generally are not legislative acts, we are hard pressed to see how attempting to persuade the Executive Branch to make a political nomination or appointment is a legislative act.

The President nominates ambassadors who must be confirmed by the Senate.  U.S. Const. art II, § 2, ¶ 2.[4]  The House of Representatives, of which Fattah is a member, plays no constitutional or legislative role in this process.[5]  The indictment recites no legislative act that Fattah performed or was trying to perform in seeking to secure an appointment for Vederman as an ambassador.  Rather, Fattah's efforts fit squarely within the political role of a Congressman to gain a high-level post for a political supporter and are not embraced by the Speech or Debate Clause.

---

4.  Specifically, Article II, § 2, ¶ 2 provides in relevant part:

> . . . [H]e [the President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

5.  This, of course, does not mean that Fattah was not engaged in an official act.  We will deal with this issue elsewhere.

When Fattah's endeavors to secure an ambassadorship for Vederman faltered, he sought to obtain for him from the Executive Branch membership on a United States Trade Commission.  Even if Senate confirmation was not required, there was nothing legislative about what Fattah did.  Again, Fattah was acting in a political role in seeking to win a political job for a political supporter.

Fattah suggests that in seeking a high-level appointment for Vederman, he was also engaging in legislative oversight.  We agree that legislative oversight, that is monitoring the work of the Executive Branch, is protected under some circumstances under the Speech or Debate Clause.  See McDade, 28 F.3d at 294-300.  Nonetheless, we cannot imagine how under any circumstance the effort to obtain a federal post for Vederman could be deemed to fall within the ambit of the Speech or Debate Clause.  Fattah's undertaking was political and not legislative in character.  Counsel for Fattah conceded at oral argument that the indictment itself contains no language which states, or from which it can be reasonably inferred, that he was engaging in legislative oversight.  Even assuming that the court could consider matters outside the indictment in deciding this issue, Fattah has the burden of proof but has come forward with no supporting evidence.  See Lee, 775 F.2d at 524.  The oversight

-20-

argument has no substance and is rejected.  See McDade, 28 F.3d at 299-300.

All the counts that Fattah seeks to dismiss, namely Counts Three, Sixteen and Seventeen, reference either the promise of Fattah to obtain an earmark for the Lindenfeld "Blue Guardians" organization in return for something of value from Lindenfeld, that is the forgiveness of a campaign debt, or the payment of bribes by Vederman in return for Fattah's attempt to influence the action of the Executive Branch on Vederman's behalf.  The Founders sought to protect the independence of the Legislative Branch by writing into the Constitution that "for any Speech or Debate in either House,[Senators or Representatives] shall not be questioned in any other Place."  See U.S. Const. art. 1, § 6, ¶ 1.  They did not endow members of Congress as super-citizens immune from prosecution for bribery or related offenses.  See Brewster, 408 U.S. at 576; Johnson, 383 U.S. at 177-83.  Nothing in this indictment threatens the independence of Congressman Fattah acting in his legislative capacity.  None of the present allegations, whether viewed separately or together, describes a legislative act.  None of the three counts in issue fits within the scope of the Speech or Debate Clause.

Accordingly, the motion of Chaka Fattah, Sr. to dismiss portions of the indictment on the ground that they violate his rights under the Speech or Debate Clause of the Constitution will be denied.