IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 15 - 346 |
| CHAKA FATTAH, Sr. | : | |

GOVERNMENT'S RESENTENCING MEMORANDUM

I.    **Introduction**

Former Congressman Chaka Fattah came to the United States Congress in 1995 running as a reform candidate for the Second Congressional District of Pennsylvania.   For over twenty years, Fattah held himself out to his constituents as a champion of education and clean government.   He now stands before this Court for resentencing after a jury found him guilty of a racketeering conspiracy for orchestrating wide-ranging public corruption over a seven-year period that that included bribes, multiple frauds, obstruction of justice, and an attempt to undermine the electoral process with a scheme that hid from his constituents his evasion of local campaign finance laws.   In committing his crimes and directing the criminal activity of others, Fattah sought to strengthen himself politically, enrich himself and his co-conspirators, steal from non-profits and the federal taxpayers, and defraud his campaigns, their creditors and a credit union.

The new Pre-Sentence Investigation Report (PSI) following remand from the Third Circuit Court of Appeals concluded that the Combined Adjusted Offense Level for the lead Count in the Indictment (RICO Conspiracy) places Fattah at total offense level of 34, calling for a sentence in the range of 151 to 188 months incarceration.   *See* PSI, ¶195.   For the reasons

discussed below, the government respectfully requests this Court resentence Fattah to concurrent terms of 120 months' imprisonment all counts of conviction, including 120 months incarceration on the reinstated Counts 19 and 20.[1]   As this Court previously announced, based upon the factors set forth in 18 U.S.C. 3553(a), this sentence is sufficient, but not greater than necessary, to account for the seriousness of Fattah's crimes, promote respect for the law, promote general deterrence, and account for the history and characteristics of the defendant.[2]

Moreover, Fattah's abuse of his status as a public official – *no less than a United States Congressman* – was so egregious and his attempts to shift the blame for his conduct to others so blatant, that concurrent 120 month sentences are wholly warranted.

## II.   <u>Background</u>

This is a case about a criminal enterprise led by former United States Congressman Chaka Fattah, Sr. that engaged in a range of corrupt activity spanning nearly a decade. The other members of the enterprise were individuals with personal and professional ties to Fattah, including two political consultants who worked on Fattah's campaigns, a former Fattah staffer who ran a Fattah-founded nonprofit organization, and a longtime Fattah supporter who was also the spouse of a former Fattah staffer. The activities of the enterprise were organized around five schemes:   the loan repayment scheme, the Blue Guardians scheme, the college tuition scheme,

---

[1] The Third Circuit specifically remanded for sentencing only as to the reinstated counts, 19 and 20, but at the same time, it contemplated that there would be a retrial on the *McDonnell*-affected counts, 16, 17, 18, 22, and 23. The Third Circuit's disposition is discussed in greater detail below.   Since the remand, the government elected not to proceed against Fattah on the latter five counts.   In these circumstances, it appears prudent to conduct a de novo resentencing on the remaining counts of conviction, including the reinstated 19 and 20. The general rule is that a court may reconsider the sentence on all counts when one is vacated, and that appears to be warranted here where five counts of conviction have been removed impacting the Combined Adjusted Offense Level pursuant to the Sentencing Guidelines.

[2] The Court's original sentence of multiple concurrent 120 month terms and one 60 month concurrent term of imprisonment was still 31 months <u>*below*</u> the newly revised recommended range pursuant to the Sentencing Guidelines.

the mortgage fraud scheme, and the fake conference scheme. Each of these schemes involved various members of the enterprise, employed similar methods, and was committed for the purpose of furthering the political and financial interests of Fattah and the other enterprise members.   The factual background has been recounted at length in the government's original sentencing memorandum (Dkt. No. 563) and also in the opinion of the Third Circuit Court of Appeals.   *See United States v. Fattah*, 914 F.3d 112, 127-139 (3d Cir. 2019).

On July 29, 2015, a grand jury in the Eastern District of Pennsylvania returned an indictment of defendants Chaka Fattah, Sr., Herbert Vederman, Robert Brand, Karen Nicholas, and Bonnie Bowser. The charges in the indictment are set forth in the table below.

| CTS | CHARGE | DEFENDANTS | SCHEME |
|---|---|---|---|
| 1 | RICO conspiracy, 18 U.S.C. § 1962(d) | Fattah, Vederman, Brand, Nicholas, Bowser | RICO |
| 2 | Conspiracy to commit wire fraud, 18 U.S.C. §§ 1343, 1349 | Fattah, Brand, Nicholas, Bowser | Loan repayment |
| 3 | Conspiracy to commit honest services wire fraud, 18 U.S.C. §§ 1343, 1346, 1349 | Fattah and Bowser | Blue Guardians |
| 4 | Conspiracy to commit mail fraud, 18 U.S.C. §§ 1341, 1349 | Fattah and Bowser | College tuition |
| 5-10 | Mail fraud, 18 U.S.C. § 1341 | Fattah and Bowser | College tuition |
| 11-15 | Falsification of records, 18 U.S.C. §§ 1519, 2 | Fattah and Bowser | |
| 16 | Conspiracy to commit bribery and honest services fraud, 18 U.S.C. § 371 | Fattah, Vederman, and Bowser | Vederman bribery |

| 17-18 | Bribery, 18 U.S.C. § 201 | Fattah and Vederman | Vederman bribery |
| 19 | Bank fraud, 18 U.S.C. §§ 1344, 2 | Fattah, Vederman, Bowser | Vederman bribery |
| 20 | False statement to a financial institution, 18 U.S.C. §§ 1014, 2 | Fattah, Vederman, Bowser | Vederman bribery |
| 21 | Falsification of records, 18 U.S.C. §§ 1519, 2 | Fattah, Vederman, Bowser | Vederman bribery |
| 22 | Money laundering, 18 U.S.C. §§ 1957, 2 | Fattah, Vederman, Bowser | Vederman bribery |
| 23 | Money laundering conspiracy, 18 U.S.C. § 1956 | Fattah, Vederman, Bowser | Vederman bribery |
| 24-26 | Wire fraud, 18 U.S.C. § 1343 | Nicholas | Fake conference |
| 27 | Money laundering, 18 U.S.C. § 1957 | Nicholas | Fake conference |
| 28-29 | Falsification of records, 18 U.S.C. § 1519 | Nicholas | Fake conference |

Prior to trial, the district court granted Nicholas' motion to dismiss Count 27.

At the conclusion of a five-week trial, the jury found defendants Fattah, Vederman, and Brand guilty of all charges. The jury found Nicholas not guilty on one count of wire fraud (Count 24) and found her guilty on the remaining charges against her. The jury found Bowser guilty of conspiracy to commit bribery (Count 16), bank fraud (Count 19), false statements to a financial institution (Count 20), falsification of records (Count 21), and money laundering (Count 22), and not guilty of the remaining charges against her.

Following trial, this Court granted the motion of Fattah for judgment of acquittal on one count of mail fraud (Count 8).  This Court also granted the motions of Fattah, Vederman, and

Bowser for judgments of acquittal on bank fraud (Count 19) and false statements to a financial institution (Count 20) on the ground that the victim alleged in the indictment, the Credit Union Mortgage Association, did not meet the statutory definition of a "financial institution."  This Court also granted their motions for judgment of acquittal on falsification of records (Count 21). And, this Court granted Vederman's motion for judgment of acquittal on RICO conspiracy (Count 1).[3]  This Court denied the defendants' post-trial motions in all other respects.

On December 13, 2016, after careful consideration this Court sentenced Fattah to concurrent terms of 60 months' imprisonment on Count 16 and 120 months' imprisonment on the remaining counts of conviction.

In crafting defendant Fattah's original sentence, this Court stated to Fattah:

Political corruption in high places is a grave matter and seriously undermines the rule of law which is the backbone of our constitutional democracy.

The Court in fashioning a sentence must act to promote the respect for the law. It is a particularly important factor when the crimes were committed by someone in your position of leadership in the government.

A crucial factor that the Court must also consider in fashioning a sentence is the need to afford adequate general deterrence to criminal conduct. While one may argue about how critical this factor is in many circumstances, I consider it very important in dealing with political corruption. Those in high places will certainly know about what happens in this

---

[3] In his resentencing memorandum, defendant mischaracterizes the bribery counts related to Vederman as the "core of the government's overarching conspiracy case."  Dkt. No. 733 at 3.   This is obviously incorrect as this Court removed Mr. Vederman and the bribery scheme from the racketeering conspiracy during the post-verdict litigation. Consistent with his earlier pleas for leniency, Fattah scarcely acknowledges the loan repayment scheme during which Fattah, Brand, and Nicholas conspired with Thomas Lindenfeld and Gregory Naylor to misappropriate $600,000 in charitable and federal grant funds from a nonprofit organization to repay an illegal loan to Fattah's unsuccessful 2007 campaign for mayor of Philadelphia.   While he seeks credit or some sort of mitigation for paying some $73,000 in restitution since his original sentencing, he was under a court-ordered obligation to do so which he was not free to ignore.   Moreover, the sums paid to date remain but a drop in the bucket compared to the amount Fattah stole – *over half a million dollars* - from a charity he created.   Not content with the returns from that scheme, Fattah entered into a corrupt bargain with Lindenfeld during the Blue Guardians scheme.   In that scheme, Lindenfeld agreed to forgive a debt owed to his company by Fattah's mayoral campaign in exchange for Fattah's promise to secure a $15 million federal appropriation for Lindenfeld to fund "Blue Guardians," a nonprofit environmental organization that did not exist.

courtroom today. It is appropriate that a sentence here be crafted to serve as a warning to others, who may consider taking the path that you did.

I must also consider your history and characteristics. Undoubtedly, you have been a good family man, a good husband, father, son, son-in-law and brother-in-law.

Much has also been said about your good works as a long time Congressman and before that as a Representative and Senator in the Pennsylvania General Assembly.

I have no doubt about the sincerity of today's speakers on your behalf as well as the many letters sent to me which laud you for your public service, particularly in the area of education for the disadvantaged as well as in the areas of housing and neuroscience. Many people are where they are today, because of your help.

Without in any way minimizing what you have done, Mr. Fattah, I must also note that it was your job to do good works, any elected official, who does not help the people, the district and the state he or she represents, is not likely to remain in office for very long.

What is so astonishing is the extent and duration of your criminal conduct. For someone so interested in advancing education for the disadvantaged, you had the temerity to steal from the Educational Advancement Alliance, a non-profit supported by Government funds, whose sole purpose was to support such education.

It is also astonishing that you would steal money to pay your son's debts and accept bribes to pay your taxes and to buy a vacation home in light of the fact that your family income appears to have been in the fabled top one percent or very close to it.

You were elected by the people of the Second Congressional District of Pennsylvania, eleven times to your seat in Congress. You abused the trust they placed in you time and time again. In addition, you pulled into your web, the other defendants indicted here and elsewhere to help you perpetuate your array of offenses.

Your flagrant behavior undermines the competence –confidence -- of the citizenry in the integrity of all public institutions and public officials. This cynicism saps the strength of our democracy. You set a particularly poor example for the young people of this country. The Court must signal to the public that your crimes are unacceptable.

Life, Mr. Fattah, is full of choices, those choices have consequences. You've made some very bad choices and they obviously have serious consequences, you must be held accountable. At the end of the day, justice must be done. While you have done much good, you have also engaged in grave and widespread criminal activity.

Balancing all of these factors and under the totality of the circumstances, the Court will commit you, Chaka Fattah, Sr. Into the custody of the Attorney General of the United States

6

for a period of imprisonment of ten years on each of the eighteen counts, except for Count 16 with a term of imprisonment it will be five years. All terms of imprisonment will run concurrently.

I will also impose -- to follow your imprisonment -- three years of supervised release on all counts, those terms of supervised release will run concurrently . . .

*. . . I also will note for the record, that the sentences that I have imposed on each count are based on factors under Title 18 United States Code, Section 3553(a) and each sentence is not in any way dependent on the sentence on any other count.*

*The Court further states, that even if the Court's advisory guideline calculations are incorrect, the Court would still impose the same sentence on each count based on the factors under Title 18 United States Code, Section 3553(a) and for the reasons stated.*

Tr. 12/12/16, at 56:08-59:25 (emphasis added.)

On direct appeal, pursuant to *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the Court of Appeals remanded for a new trial on the convictions of Fattah and Vederman as to the bribery and money laundering counts (Counts 16, 17, 18, 22, and 23).   *United States v. Fattah*, 914 F.3d 112, 2019 WL 209109, *31 (3d Cir. Jan. 16, 2019).   The Third Circuit concluded that the jury had not been properly instructed regarding "official acts" consistent with the *McDonnell* ruling.

The government cross-appealed this Court's ruling vacating the convictions of Fattah and Vederman for committing bank fraud in violation of 18 U.S.C. § 1344 (Count 19) and making a false statement to a financial institution in violation of 18 U.S.C. § 1014 (Count 20) based on the defendants' false representations to the Credit Union Mortgage Association ("CUMA") about the purpose of an $18,000 payment from Vederman to Fattah.

As to the government's cross-appeal, the Third Circuit reversed.  It held, "CUMA is a 'mortgage lending business,' and that alone suffices to support the convictions under §§ 1014 and 1344." *Fattah*, 2019 WL 209109, *53.   The Court further held, "Considered in the light most favorable to the Government, the totality of the evidence is sufficient to support the jury's

conclusion that the Porsche sale was a sham," *id*. at *54, and thus the jury's verdict on Counts 19 and 20 must be reinstated.   The Third Circuit directed:   "The convictions of Chaka Fattah, Sr. and Herbert Vederman will be reinstated, and the case will be remanded for sentencing on those counts." *Id*. at *57.

The Third Circuit disagreed with the District Court about the impact of *McDonnell* on the bribery counts and remanded for a new trial so that the jury could be properly instructed. However, in describing the trial evidence, this Court stated that, "[t]he evidence was overwhelming concerning the things of value or stream of benefits which Vederman showered on Fattah for Fattah's official acts in pursuing the ambassadorship and in the hiring of Vederman's girlfriend." Dkt. No. 538.

Specifically, the Third Circuit held:

We will vacate the convictions of Chaka Fattah, Sr. and Herbert Vederman as to Counts 16, 17, 18, 22, and 23. Fattah and Vederman may be retried on these counts before a properly instructed jury. We will also reverse the District Court's judgment of acquittal on Counts 19 and 20. *The convictions of Chaka Fattah, Sr. and Herbert Vederman will be reinstated, and the case will be remanded for sentencing on those counts. In all other respects, the judgments of the District Court will be affirmed*.

*Fattah*, 914 F.3d at 188 (emphasis added).

On March 18, 2019, the United States Supreme Court denied Fattah's petition for a writ of certiorari.   *Fattah v. United States*, 139 S.Ct. 1325 (Mem), 203 L.Ed.2d 566 (March 18, 2019).

**III**.   **Sentencing Guidelines**

The revised Pre-Sentence investigation concluded that the Combined Adjusted Offense Level for the lead Count in the Indictment (RICO Conspiracy) places Fattah at total offense level of 34, calling for a sentence in the range of 151 to 188 months incarceration.   *See* PSI, ¶195.

### A. Defense Objections

Fattah made several objections regarding the PSR to Probation and the government addresses two of those in turn.

## Paragraph 34 and Use of the Word "Bribery"

Firstly, Fattah sought to amend paragraph 34 to strike the reference to 'bribery."   The revised PSI has omitted the word "bribery" from the description of Fattah's offenses.   However, defendant Fattah was charged and convicted with honest services wire fraud conspiracy in Count Three.   By definition, honest services wire fraud requires evidence of a bribe.   *See Skilling v. United States*, 130 S.Ct. 2896, 2931 (2010) (prosecution for violations of 18 U.S.C. § 1346 must be limited to honest services fraud schemes that involve bribery/kickbacks).   In order to convict on Count Three, the jury necessarily found that Fattah engaged in bribery during the Blue Guardians Scheme.   Moreover, the Third Circuit affirmed Fattah's conviction on Count Three. "Bribery" should be re-inserted into paragraph 34 describing Fattah's criminal conduct.   The United States asks the Court to overrule this objection by Fattah to the PSR.

## Paragraph 238 and Fattah's Conduct While Incarcerated

Next, Fattah requested that Paragraph 238 incorporate Fattah's conduct while incarcerated and he provided Probation with a list of course work completed while serving his sentence at FCI McKean.   Fattah's post-sentence academic career within the confines of a facility operated by the Bureau of Prisons is hardly a justification for revisiting Fattah's sentence.   His compliance with the institution's rules and his participation in ordinary beneficial activities in prison is expected of inmates, particularly one of Fattah's education and background, and does not warrant leniency.

### B.  Government Objections

The government respectfully submits that references to the evidence and factual support underlying the fraud allegations involving defendant Chaka Fattah, Sr., and Herbert Vederman should not have been removed from the revised Presentence Investigation Report.   That evidence constitutes Relevant Conduct pursuant to U.S.S.G. 1B1.3.

In late 2011, former Congressman Chaka Fattah and his wife entered into a contract to purchase a vacation home in the Pocono Mountains. Tr. 6/2/16 AM, at 77:22-89:13 (Exh. CUMA-19).   An estimate they received in late December 2011, which the Fattahs signed, advised them that they would need to pay approximately $118,000 to the seller at the closing, which was scheduled for late January 2012.   Id.   The Fattahs did not have the funds to make that payment.   Tr. 6/2/16 PM, at 43:1-48:15.

Right around the time the Fattahs received the closing-cost estimate, Fattah also received an email from defendant Herbert Vederman's girlfriend, Alexandra Zionts.   Zionts had been employed with the federal judiciary in Florida, where she lives.   However, Zionts was terminated abruptly from that position ten months before she became eligible for discontinued service retirement benefits, which meant she needed to find a new position in the federal government to avoid a break in her federal service that would have disrupted her employment benefits.   Vederman agreed to help Zionts find another job, and he made several calls on her behalf, including a call to Fattah.   Zionts eventually spoke with Fattah about a job on his staff, and on December 26, 2011, just as the Fattahs were receiving their closing costs estimate, Zionts sent Bowser an email addressed to Fattah describing her situation and attaching a resume and letters of recommendation.   Tr. 6/1/16 AM, at 105:16-141:5.

On January 13, 2012, approximately three weeks after Zionts sent her resume to Fattah, Vederman wired Fattah $18,000.   Soon after receiving this wire transfer, Fattah wired $25,000 to an escrow account for the vacation home closing. *United States v. Fattah*, 914 F.3d 112, 2019 WL 209109, *12 (3d Cir. Jan. 16, 2019).   Without the $18,000 wire from Vederman, Fattah would not have been able to cover the $25,000 escrow payment. Id.

On January 19, 2012, six days after Vederman wired Fattah $18,000, Zionts received a letter from Bowser welcoming her to Fattah's congressional staff in his Philadelphia office. Exh. AZ-1.

For the two months that Zionts was employed by Fattah, she spent approximately half her time in Florida, although she did not take leave for that time.   Tr. 6/1/16 AM, at 124:9-17. Several individuals who worked in Fattah's Philadelphia office during Zionts' brief tenure testified that they did not know what her responsibilities were or what kind of work she was doing for the office.   Tr. 6/1/16 AM, at 44:14-60:2 (Dolores Ridley); Tr. 6/1/16 AM, at 64:17-75:16 (Tia Watson).   According to Zionts, she spent a "large part of [her] time" on an archiving project with Temple University, Tr. 6/1/16 AM, at 122:12-,130:16, but this "archiving project" consisted of one brief phone call and two emails, and nothing came of the project because Fattah's office had nothing the university was interested in archiving.   *See Fattah*, 2019 WL 209109, *12.   The hiring of Zionts put Fattah's congressional office over budget.   *Id*.

### Concealment of the $18,000 Payment

In an elaborate scheme of deception involving the creation of a fictitious email trail, a fake bill of sale, and a duplicate title, Fattah and Vederman used the bribery proceeds to defraud

the bank into extending to the Fattahs a $325,000 mortgage.   The defendants concealed the

$18,000 payment from Vederman to Fattah as the proceeds of a car sale that never happened.

On January 12, 2012, the day before Vederman's $18,000 wire to Fattah, Fattah's wife, Renee

Chenault-Fattah, wrote to Vederman from Fattah's email account offering to sell him her 1989

Porsche 911 Carrera.   Exh. C-9.   Vederman responded less than two hours later agreeing to buy

the car.   Exh. C-10.   The next day, Vederman sent his bank three separate emails inquiring

about the status of the wire transfer to Fattah.

On January 17, 2012, Victoria Souza, a loan processor for the Credit Union Mortgage

Association (CUMA), the mortgage company handling the purchase of the vacation home,

emailed Fattah specifically asking about the source of the $18,000 that Vederman had just wired

into Fattah's account.   Exh. CUMA-5.   Fattah responded to Souza that "the $18,000 represent

[sic] the proceeds from the sale of a car we owned."   *Id*.   Souza then requested that Fattah

provide a copy of the bill of sale and signed title to confirm the transaction. *Fattah*, 2019 WL

209109, *12.   Fattah forwarded his email exchange with Souza about the purported car sale to

Vederman.   J.A. 4349.

In the four days after the $18,000 wire transfer from Vederman to Fattah, neither the

purported buyer nor the purported seller said anything about documenting the car sale.

However, just minutes after Souza emailed Fattah requesting that documentation, the defendants

began making the arrangements to create a signed bill of sale and a copy of the title for the

Porsche signed over to Vederman.   The duplicate title was notarized, despite the fact that the

seller, Chenault-Fattah, never appeared before the notary.   *Fattah*, 2019 WL 209109, *12.

Bowser emailed the bill of sale and signed-over title to Souza from Fattah's email account on

January 19, 2012, the same day that Zionts received the letter from Bowser confirming her employment in Fattah's Philadelphia congressional office.   Exh. CUMA-9; Exh. CUMA-10. The bill of sale that Fattah sent to Souza was backdated to January 16, 2012, the day before Souza requested the car-sale documentation from Fattah.   *Fattah*, 2019 WL 209109, *12.

Notwithstanding Fattah's representations to CUMA, the Fattahs continued to act as though they still owned the Porsche.   In May 2012, approximately five months after the supposed car sale, the Fattahs reinstated insurance coverage on the Porsche without informing the insurance company of any change in ownership.   Dkt. No 410 at 3-5.   That same month, Fattah's wife renewed the registration of the Porsche in the Fattahs' name.   *Id*. at 3.   Even at the time of trial, that car had never been registered to Vederman.   *Id*.   In June 2012, approximately six months after the supposed car sale, Fattah's wife had the Porsche serviced at a car dealership, paying for the maintenance with her credit card.   *Id*.   In November 2012, over ten months after the supposed car sale, Fattah's wife called their insurance company to report that "we have the Porsche which we take off of insurance during the winter because we have it just in the garage," and to confirm that the Porsche was "still covered" because "it'll be in the garage," once again without mentioning any purported car sale.   Dkt. No. 410 at 4-5; Exh. C-26a, transcript of recording admitted as Exh. C-26.   And in March 2014, over two years after the supposed car sale, the FBI found the Porsche in the Fattahs' garage.   Tr. 6/1/16 PM, at 107:3-119:18.   Inside the Porsche, the FBI found handbags and clothing, an insurance card in the name of the Fattahs, a registration form in the name of Chenault-Fattah, and a parking receipt from October 2012. *Id*.

On direct appeal, pursuant to *McDonnell v. United States*, 136 S.Ct. 2355 (2016), the Third Circuit Court of Appeals remanded for a new trial on the convictions of Fattah and Vederman as to the bribery and money landering counts (Counts 16, 17, 18, 22, and 23).   *United States v. Fattah*, 914 F.3d 112, 2019 WL 209109, *31 (3d Cir. January 16, 2019).   The Third Circuit concluded that the jury had not been properly instructed regarding "official acts" consistent with the *McDonnell* ruling.

On appeal, the bribery convictions were also attacked his convictions, in part, on the argument that there was insufficient evidence of a bribery scheme.   The Third Circuit rejected this position, holding:

> Vederman argues that there is insufficient evidence to support a conviction, even if a jury were properly instructed under McDonnell.   Specifically, Vederman argues that there is insufficient evidence to convict him and Fattah, after remand, on Counts 16–18 and 22–23 because "[a]t least seven of the eight alleged 'official acts' were, as a matter of law, not official at all."   Vederman Br. 35.   As to the single act that Vederman implicitly concedes to be an official act—the Zionts hiring—Vederman argues that "[t]he only thing that even arguably associates" the Zionts hiring with Vederman was its timing in relation to Vederman's sham purchase of the Fattahs' Porsche.   Id.   According to Vederman, "the undisputed chronology precludes any inference that Vederman conferred this benefit on his friend as an illegal bribe."   Id. (emphasis omitted).   Vederman is wrong. Sufficient evidence was produced at trial to have allowed a properly-instructed jury to convict Fattah and Vederman of Counts 16–18 and 22–23.

> To begin with, even if the Zionts hiring had been the sole official act to survive this Court's interpretation of McDonnell, there would still be sufficient evidence to convict Fattah and Vederman.   Zionts did not receive written notice of her official hiring until six days after the sham Porsche purchase.   Moreover, the jury would not be restricted to considering the chronology of the sham purchase alone. It would be free to consider Vederman's entire course of conduct.   Under the general heading "VEDERMAN'S Payments and Things of Value to FATTAH," the redacted indictment not only refers to the $18,000 wire transaction from Vederman to Fattah as part of the sham Porsche purchase, but also to Vederman's $3,000 payment for the college tuition of Simone Muller, Fattah's live-in au pair, as well as thousands of dollars in payments made by Vederman for Chip Fattah's college tuition. JA496–97.

And the Zionts hiring is not the only act to survive our application of McDonnell.   As we explained, a jury could find that Fattah's efforts to secure Vederman an ambassadorship—three emails, two letters, and a phone call—were an impermissible attempt to "pressure or advise" President Obama, Senator Casey, or both men.   This means that a properly instructed jury on remand, presented with evidence of Fattah's efforts to secure an ambassadorship for Vederman and evidence of the Zionts hiring, *could find more than a single official act.*

*United States v. Fattah*, 914 F.3d 112, 2019 WL 209109, *31 (3d Cir. January 16, 2019).

The evidence that the $18,000 was actually a bribe payment included:

- the timing of the payment, which was made just a few days before Zionts received a letter from defendant Bonnie Bowser welcoming her to Fattah's staff, Exhs. C-17 (Vederman bank records showing $18,000 wire transfer on January 13, 2012, AZ-1 (letter from Bowser to Zionts welcoming her to Fattah's staff dated January 19, 2012);

- testimonial and documentary evidence that Zionts spent approximately half the time she was employed by Fattah in Florida;

- testimonial and documentary evidence that Zionts did very little work during her brief tenure in Fattah's Philadelphia office; and

- documentary evidence that the hiring of Zionts put Fattah's congressional office over its annual budget, Exh. AZ-44.

The evidence that no car sale actually occurred included:

- Documents showing that Fattah's wife had the Porsche serviced at Don Rosen imports in June 2012, approximately six months after the supposed car sale. Exh. C-22; Tr. 6/1/16 PM, at 98:9-103:15.

- Documents showing that the Porsche's registration was renewed in May 2012, approximately five months after the supposed car sale. Exh. C-23; Tr. 6/2/16 PM, at 7:19-15:25.

- Documents showing that the Fattahs paid automobile insurance on the Porsche in February 2012, just weeks after the supposed car sale, never advising the insurance company of any purported car sale. Exh. C-38; Tr. 6/1/16 PM, at 33:4-52:25.

- A recorded call between Fattah's wife and the insurance company in November 2012, over ten months after the supposed car sale, in which Fattah's wife told the insurance company representative that "we have the Porsche which we take off of insurance during the winter because we have it just in the garage," and explained

to the representative that the Fattahs wanted to make sure the Porsche was "still covered" because "it'll be in the garage," once again without mentioning any purported car sale. Ex. C-26.

•      Testimony that in March 2014, over two years after the supposed car sale, the FBI found the Porsche sitting in the Fattahs' garage, as well as photographs showing items found in the car by the FBI, including handbags and clothing in the trunk and back seat, an insurance card in the name of the Fattahs, a registration form in the name of Fattah's wife, and a parking receipt from October 2012. Tr. 6/1/16 PM, 107:3-118:19; Exh. C-28 (photos).

Strikingly, even Vederman's appellate attorneys even conceded on appeal at oral argument that Fattah's hiring of Vederman's girlfriend constituted an "official act" for purposes of the federal bribery statute.   *Fattah*, 2019 WL 209109, *28 ("Vederman concedes that the Zionts hiring was an official act").

Indeed, the evidence admitted at trial showed that the $18,000 from Vederman to Fattah could not have been a gift. Fattah's former ethics officer Nuku Ofori testified that a member of Congress cannot accept a gift over $250 from a friend without the written permission of the House Ethics Committee.   Tr. 5/31/16 PM, at 54:13.   The government introduced an example of an application for such permission written by Fattah himself regarding a trip that Fattah took in 2005 to the Super Bowl. Exh. MISC-21; Tr. 6/3/16, at 6:9-8:12.   That application included a three-paragraph description of Fattah's personal and professional relationship with the person funding the trip.   *Id*. at 8:2-11.   There was no evidence that Fattah requested the written permission of the House Ethics Committee to accept an $18,000 gift from Vederman. Moreover, Fattah would never have submitted an application for written permission to accept a gift from Vederman given the disclosures he would have had to make in that application,

including his decision to hire Vederman's girlfriend to a federal government job just days after he accepted the "gift."

The government was required to prove that the defendants executed a scheme to defraud CUMA "by means of false…representations." 18 U.S.C. § 1344 (emphasis added); Jury Instr. ¶ 148.   This "by means of" language is satisfied when "the defendant's false statement is the mechanism naturally inducing" the financial institution "to part with money in its control." Loughrin v. United States, 134 S. Ct. 2384, 2393 (2014).    The government satisfied this element with evidence showing that the defendants made false statements to CUMA about the provenance of the $18,000 wire transfer so that Fattah could obtain a mortgage on the Poconos house.

As discussed above, the defendants created the bill of sale and signed-over title only after CUMA employee Victoria Souza advised Fattah that she needed documentation to support his false representation that the $18,000 wired to his account constituted the proceeds of a car sale. Exh. CUMA-6.   As Souza testified at trial (and as she told Fattah at the time), without that documentation, she would not have been able to approve Fattah's mortgage application. Tr. 6/2/16 AM, at 99:1-21, 117:12-118:17; Exh. CUMA-13.   Souza also testified that, if she had learned that in fact no car sale took place (as the evidence showed), then CUMA would not have approved the mortgage.   Tr. 6/2/16 AM, at 118:18-23. Souza further testified that, if she had learned that the $18,000 was actually the proceeds of a bribery scheme (again, as the evidence showed), then CUMA would not have approved the mortgage. Id. at 119:14-18.

According to Souza, an examination of the Fattahs' finances was intended to reveal whether or not the congressman and his wife had the financial wherewithal to take on the

mortgage in the first place.   Tr. 6/2/16 AM, at 103:20-123:23.   In making that determination, CUMA was relying on the Fattah's veracity and the accuracy of their mortgage application. Souza was clear that an unexplained deposit of $18,000 into an applicant's bank account would generate a red flag and not survive scrutiny during the mortgage process.   Tr. 6/2/16 AM, at 103:13-109:3.   Additionally, Souza testified that even an $18,000 gift might not have been acceptable to CUMA. Tr. 6/2/16 AM, at 119:19-120:22.   Souza explained that if CUMA had been told that the $18,000 payment from Vederman to Fattah was a gift, then CUMA would have required additional documentation, including "a gift letter, a copy of the donor's ability to give the gift and a paper trail" in order to determine whether the gift met CUMA's guidelines.   Id.

In other words, had Fattah told CUMA that the $18,000 was merely a gift from a wealthy friend, that too would have been a false representation.   To be sure, the government presented evidence at trial that Fattah could not have made that false representation to CUMA because Fattah was not allowed to accept a gift from Vederman without a waiver, which he did not obtain.   But that does not change the fact that a truthful statement from Fattah in response to Souza's inquiry about the source of the $18,000 would have revealed that the money was a bribe payment and would have caused CUMA not to approve the mortgage application.   Accordingly, it was only "by means of" the false statement to CUMA about the source of the $18,000 that Fattah obtained the mortgage on the Poconos house.

For all of these reasons, the underlying facts and circumstances motivating both Fattah and Vederman to lie to CUMA regarding the source of the $18,000 wired from Vederman to Fattah during the mortgage process constitute relevant conduct to be considered and weighed at

sentencing.   Therefore, those facts should not be omitted from the Presentence Investigation Report.

**IV.**   <u>**Analysis of Sentencing Factors**</u>

The Supreme Court has declared, "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."   *Gall v. United States*, 128 S. Ct. 586, 596 (2007).   Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses, and should be considered before the application of the downward departure motion.

However, this Court must - *and did* - carefully consider all of the sentencing considerations set forth in Section 3553(a).   Those factors include: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (5) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (6) the guidelines and policy statements issued by the Sentencing Commission; (7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (8) the need to provide restitution to any victims of the offense.   18 U.S.C. § 3553(a).

A.   **The nature and circumstances of the offense**

In sum, Fattah and his associates engaged in a pattern of fraudulent and corrupt conduct over the course of Fattah's congressional career, including misappropriation of hundreds of

thousands of dollars of federal funds and honest services fraud, including bribery.   Fattah

repeatedly made conscious decisions to commit crime after crime *over a period of years*.

Congressman Fattah was the de facto leader of a criminal racketeering enterprise and that

enterprise consisted of current and former Fattah congressional staffers and their family

members, political operatives, and supporters.   The enterprise existed primarily to support

Fattah's ambitions or desires, whether they were political (e.g., Fattah's attempt to corrupt the

2007 mayoral race in Philadelphia[4]) or financial (e.g., the payment of personal family debts via

fraud).   Throughout his career and his crime spree, Fattah surrounded himself with individuals

who were loyal to him and willing to engage in criminal acts.   Fattah rewarded many of his co-

conspirators and key aides for their extraordinary loyalty with employment in either his

congressional office or with one of the various non-profits founded by Fattah or he provided

them with stints on his campaigns.   Fattah often cycled his subordinates through a sort of

revolving door between the campaigns, his staff, and EAA and CORE Philly.   The subordinate

members of Fattah's schemes all benefitted financially in some form or fashion.   These

extremely serious and wide-ranging offenses easily call for a guideline sentence.

    B.    **History and characteristics of the defendant**

Chaka Fattah, Sr., was a United States Representative for the 2nd Congressional District

of Pennsylvania.   He served as the senior member of the House Appropriations Committee and

the Ranking member of the subcommittee on Commerce, Justice, Science and related agencies.

In 2006-2007, Congressman Fattah entered the race for Mayor of the City of Philadelphia and

---

[4] Significantly, Fattah's scheme to evade the contribution limits in the mayoral race by accepting
the Lord loan in the first place undermined one of the core goals of the applicable campaign
finance laws—transparency.

was soundly defeated.   His mayoral run was supported by the Fattah for Mayor ("FFM") campaign and his congressional reelection campaigns have been supported by Fattah for Congress ("FFC").   Fattah diverted funds from both campaign accounts for personal uses.   The Congressman was the leader of his political organization and directed other members of his organization in furtherance of its affairs.

In the PSR, Fattah recounted "a 37-year history of civic service."   According to the defendant, "he spent his entire career in state and federal government."   In 1983, he was elected to the Pennsylvania state legislature where he served until 1995.   Prior to that, he worked in as a special assistant to the managing director and housing director of the City of Philadelphia.   In 1984, he attended Harvard's Kennedy School of Government and received a certificate in a program for senior executives in state and local government.   He was first elected to the Congress in November of 1994 and served 11 consecutive terms, earning approximately $174,000 annually.[5]   ¶ 243.   As a career public servant, he was especially qualified to understand the gravity of his many crimes.   Fattah understood the power and trust given to elected officials and that corruption benefits the few at the expense of the many.   Despite the advantages of his career and education, Fattah chose to violate the trust of his constituents and the taxpayers to line his pockets and advance his personal and professional goals at their expense.

In the PSR, Fattah also makes much of his alleged contributions to his constituents with various references to his role in Gaining Early Awareness and Readiness for Undergraduate

---

[5] During the mortgage scheme, Fattah's wife was earning $28,317 *monthly* as a local television news anchor.   Exh. CUMA2.

Programs ("GEAR UP").   ¶ 247.   Fattah also takes credit for founding College Opportunity Resources for Education ("CORE") Philly and Educational Advancement Alliance ("EAA"), but conspicuously fails to reference their roles in his criminal schemes.   ¶¶ 248, 251.

In his consistently self-serving fashion, Fattah ignores entirely his criminal exploitation of EAA and CORE Philly.   Just like his campaign organizations, FFM and FFC, those entities are properly understood as extensions of Fattah.   In addition to providing employment for Fattah's associates and former aides, as well as access to funds, *i.e.*, the money used to repay Lord, II in Scheme 1, both EAA and CORE Philly provided Fattah with essentially free political advertising and messaging,[6] as well as photo opportunities for Fattah.   As the Court is well aware, both entities were significant and necessary to Fattah's various schemes.

EAA was a non-profit entity founded by Fattah in 1990 with the publicly-announced purpose of providing educational information and opportunities to members of underrepresented groups.   EAA was routinely staffed by former congressional aides to Fattah besides Nicholas, including his most recent DC-based Chief of Staff Roger Jackson.   For years, EAA was responsible for organizing the now-defunct annual Fattah Conference.   Additionally, EAA obtained federal grant funds for the operation of the so-called "Fattah Learning Lab," a large white bus converted to a mobile classroom outfitted with computer and science equipment and emblazoned with Fattah's name on its exterior.   The tax-payer funded "Fattah Learning Lab" made trips to Philadelphia public schools during the mayoral campaign.   EAA also represented an opportunity for Fattah to gain access to much needed funds.   Grant funds specifically

---

[6] The evidence at trial showed that federal auditors had specifically become concerned about this type of misuse of the non-profits by Fattah.   Tr. 5/23/16 AM, at 88:22-91:20 (testimony of Thomas Puerzer).

dedicated by NASA to the "Fattah Learning Lab" were stolen by Fattah and his enterprise in order to satisfy Fattah's obligations.

CORE Philly was a non-profit entity founded by Fattah in 2003 with the announced purpose of forming a partnership between the City of Philadelphia, the School District of Philadelphia, and the School Reform Commission to provide college scholarships to Philadelphia high school students.   At its inception, Fattah obtained grant funding from Sallie Mae's charitable arm (the same entity supported Fattah's annual Conference) to support CORE Philly's operations.

Nicholas and EAA served as a fiduciary agent of various federal grants to CORE Philly, and was therefore perfectly situated to raid CORE Philly's scholarship funds at Fattah's direction to repay Robert Brand the $100,000 he advanced to cover a portion of the illegal campaign loan owed to Al Lord.   It is still striking that Fattah seeks some type of credit for these organizations at the time of sentencing when at trial he attempted through his defense to shift the blame for the financial shenanigans at EAA and CORE Philly to subordinates who his attorneys argued acted without Fattah's knowledge to settle Fattah's obligations.

Throughout these proceedings, Fattah has tried to shift the blame to everyone but himself. Displaying no remorse since he was indicted, Fattah has made unsubstantiated public allegations to the media suggesting that the criminal charges against him were motivated by some unspecified political agenda on the part of the prosecutors and federal investigators.

It is well-settled that "lack of remorse is a fact that a district court can consider in its evaluation of the § 3553(a) factors." *United States v. Sweat*, 573 F. App'x 292, 298 (4th Cir. 2014); *see also United States v. Keskes*, 703 F.3d 1078, 1090-91 (7th Cir. 2013) ("A lack of

remorse is a proper sentencing consideration 'because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform) and deterrence (a remorseful criminal is less likely to return to his old ways).'" (citation omitted)); *United States. v Mitchell*, 681 F.3d 867, 884-85 (6th Cir. 2012 (bribery case; distinguishing lack of remorse, where defendant persisted in denying his involvement following jury verdict, from exercise of trial right); *United States v. Cruzado-Laureano*, 527 F.3d 231, 236-37 (1st Cir. 2008) (rejecting argument that lack of remorse in § 3553 analysis   was unfair "double counting" where court also denied downward offense level adjustment for acceptance of responsibility); *United States Smith*, 424 F.3d 992, 1016-17 (9th Cir. 2005) (approving district court's above-Guidelines sentence in a tax protestor fraud case based in part on defendant's lack of remorse).   Here, the defendant's lack of remorse is an aggravating factor that speaks poorly to Fattah's characteristics and potential for rehabilitation.

    C.    **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

Again, it is difficult to overstate the seriousness of Fattah's crimes given the unique position of trust that elected officials hold in our democratic system.   Fattah was not a low-level government employee with limited decision-making authority or influence who accepted a small bribe to augment a relatively small salary.   To the contrary, he was a powerful, sophisticated and long-serving member of the U.S. House of Representatives.   His myriad crimes have only further undermined public confidence in the integrity of public officials and the Congress in particular.   This Court should impose a sentence that reflects the seriousness of Fattah's willingness to sell his office, participate in criminal attempts to influence the electoral process,

and undermine the public's confidence in its elected representatives.   As the Eleventh Circuit

observed:

> Bribery [and honest services fraud] cannot properly be seen as a victimless crime, for in a
> sense it threatens the foundation of democratic government.   Putting aside the financial
> havoc it can cause, bribery tears at the general belief of the citizenry that government
> officials will carry out their duties honestly, if not always competently.   And that harm,
> though it may at times appear intangible, is real.

*United States v. Hayes*, 762 F.3d 1300, 1309 (11ᵗʰ Cir. 2014).

     D.    **The need to afford adequate deterrence to criminal conduct, and to protect
the public from further crimes of the defendant.**

As we observed previously, while it may be unlikely that Fattah will ever again be in a

position to run for elected office, the sentence imposed must also be sufficient to deter other

public officials.   *See United States v. Phinazee*, 515 F.3d 511, 515-16 (6ᵗʰ Cir. 2008) (deterrence

for § 3443(a) purposes includes both specific and general deterrence).   Put differently;

> We need not resign ourselves to the fact that corruption exists in government.   Unlike
> some criminal justice issues, the crime of public corruption can be deterred by significant
> penalties that hold all offenders properly accountable.   The only way to protect the
> public from the ongoing problem of public corruption and to promote respect for the rule
> of law is to impose strict penalties on all defendants who engage in such conduct, many
> of whom have specialized legal training or experiences.   Public corruption demoralizes
> and unfairly stigmatizes the dedicated work of honest public servants.   It undermines the
> essential confidence in our democracy and must be deterred if our country and district is
> ever to achieve the point where the rule of law applies to all – not only to the average
> citizen, but to all elected and appointed officials.

*United States v. Spano*, 411 F.Supp. 2d 923, 940 (N.D. Ill. 2006).

Here, deterrence is a particularly compelling basis for a heavy sentence in a case like

this where the community in general and politicians in particular are watching closely and will

learn of and discuss the outcome of these proceedings.

**VI.**     <u>**Conclusion**</u>

We recommend that this Court resentence Fattah to concurrent terms of 120 months' imprisonment on all the counts of conviction, including 120 months incarceration on the reinstated Counts 19 and 20.   For all of the aforementioned reasons, such a sentence is warranted, appropriate, reasonable, and sufficient – but not more than necessary – in this case. Imposing the recommended sentence demonstrates that corruption of the electoral process will be punished severely and that public money must be used for the public's interest, not for the private and political interests of a public official and his confederates.

Respectfully submitted,

JENNIFER A. WILLIAMS
Acting United States Attorney

<u>s/ Eric L. Gibson</u>
Trial Attorney
Assistant United States Attorney

<u>s/ Paul L. Gray              </u>
PAUL L. GRAY
Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Government's Resentencing

Memorandum has been served this date, by electronic mail upon:

Samuel W. Silver
Schnader Harrison Segal & Lewis LLP
Attorneys at Law
1600 Market Street, Suite 3600,
Philadelphia, PA 19103


 s/Eric L. Gibson
ERIC L. GIBSON
Assistant United States Attorney


DATE: July 10, 2019